867 A.2d 305

**John Louise WILLIAMS**

v.

**STATE of Maryland.**

**No. 73, Sept. Term, 2004.**

Court of Appeals of Maryland.

Feb. 4, 2005.

Arthur A. DeLano, Jr., Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

## I.

In the Circuit Court for Baltimore County on 9 October 2003, Appellant, John Louise Williams, pleaded guilty to one count of theft over $500. At the plea proceeding, the Assistant State's Attorney recited the following supporting statement of facts, which were agreed to by Appellant's trial counsel, although she reserved the right to argue as to restitution:

> Your Honor, the State in support of the defendant's guilty plea, on April 1st, 2003 Officer Grelak, G–R–E–L–A–K, responded to 7600 Gough Street for a burglary. Upon arrival he spoke with the victim, Craig Jones. Mr. Jones advised that between March 31st, 2003 at approximately 9 o'clock p.m. and April 1st, 2003 at 9:15 a.m., unknown subjects cut the padlock [1] on the far side door of his garage

---

1. Although Williams was charged, among other things, with malicious destruction of property to wit, the padlock, and the Application For

and removed the following items: A 1975 Yamaha GT80R motorcycle, a Suzuki DS–80 motorcycle, a 1994 Yamaha PW50 motorcycle, and finally a 2002 Yamaha TTR225R motorcycle. The total value of the property loss was $4,100.

On April 3rd, 2003, a teletype was received at Precinct 12 in reference to the recovery of the 2002 Yamaha TTR225R motorcycle. The motorcycle was recovered by Officer Saunders of the Baltimore City Police, Northeast District. She advised that she recovered the motorcycle along with three others on April 2nd, 2003 in the rear yard of 3018 Clifton Park Terrace. The motorcycle was in possession of John Louise Williams and Alan Williams. Both were arrested and the motorcycles were towed for storage.

On April 24th, 2003, Detective Claridge along with Sergeant Stelmack met with Craig Jones at the Baltimore City impound lot to identify the stolen motorcycles. Mr. Jones identified an additional motorcycle as belonging to him. He identified it by the white epoxy on the tail pipe.

Specifically, Judge, what unfortunately happened, the motorcycle that was the most expensive was actually recovered and returned to the victim. There was a—Mr. Jones was actually maintaining possession of that motorcycle for another individual who had properly titled it. That motorcycle was subsequently returned to the victim, the owner of the motorcycle. The other three motorcycles, because Mr. Jones used them for off road purposes· and rightly or wrongly did not title them, [the] Baltimore City impound lot would not return them to him despite the fact that they were recovered and Mr. Jones identified them as belonging to him. So he of course is still out the $1500, and that, I think, is the subject of the restitution issue that we're going to argue about.

---

Statement of Charges claimed the padlock was valued at $5.00, neither figured in the State's rendition of the statement of facts offered in support of the guilty plea to the theft over $500 count. Thus, the asserted value of the padlock had no bearing on whether the restitution ordered in connection with the theft count was appropriate.

This case did occur in Baltimore County. Of course Mr. Jones did not give anyone permission to remove any cycles or have them without his permission.

The trial judge found the facts sufficient to support the guilty plea and, accordingly, found Appellant guilty. As to sentence, defense counsel argued:

[DEFENSE COUNSEL]: Regarding the issue for restitution, Your Honor, all the property was recovered. The fact that it wasn't returned by the Property Division by the impound lot is not within Mr. Williams' control. The fact that the victim didn't have it properly titled to himself is not Mr. Williams' fault. That is an issue for the victim. The restitution would not be owable by Mr. Williams for property that is recovered. That's an entirely separate issue as to whether or not the impound lot released it to the victim or to whoever it's titled to. It's the same as if the victim has it and it's titled to a third person, he can simply ask the third person to get it released. It's not restitution that Mr. Williams owes.

THE COURT: Well, he wouldn't have had to worry about the recovery if Mr. Williams didn't steal it, would he?

[DEFENSE COUNSEL]: Certainly not. It wouldn't be in the impound lot but for Mr. Williams' actions. But if he didn't have it insured or licensed for some reason, that has nothing to do with Mr. Williams. That's an issue the victim has with the MVA regarding the motorcycle, not with Mr. Williams. And I would ask Your Honor not to impose restitution since the property has been recovered.

It seems to me there are other avenues that the victim can pursue with the person who indeed does have the title.

In arguing for restitution, the prosecutor explained:

I was up front with [Defense Counsel]. I told her that the bikes were actually recovered and that in speaking with the victim, the victim explained to me—and he's not here today because he actually has testicular cancer and was just coming off his chemotherapy—was that he just didn't title them because he used them for off road. And again,

whether rightly or wrongly, that's what he indicated and the impound lot would not return them to him.

I sort of take the same view as the Court, I'd otherwise defer to the Court, that but for Mr. Williams, he would still have these bikes. That's the reason I'm asking for the restitution, but I'll defer to the Court on that as well.

The trial judge, in addition to imposing a sentence of five years incarceration (all but 30 months suspended and five years probation), ordered Williams to pay restitution to Jones in the amount of $1,500.

Williams appealed to the Court of Special Appeals, challenging the legality of the order of restitution component of his sentence. Before the intermediate appellate court decided the appeal, we, on our initiative, issued a writ of certiorari to consider the sole question of whether the order of restitution was legal. *Williams v. State*, 383 Md. 211, 857 A.2d 1129 (2004). Oral argument was held in this case on 7 December 2004, the day after the Court's opinion in *Pete v. State*, 384 Md. 47, 862 A.2d 419 (2004) was filed. *Pete*, as we make clear later, has a marked effect on the outcome of the present case.[2]

## II.

Md.Code (2001, 2004 Supp.), Criminal Procedure Article, § 11–603, the relevant part of the statutory scheme governing restitution in criminal cases,[3] provides in pertinent part as follows:

---

**2.** To their credit, counsel for both parties at oral argument expressed awareness of *Pete* and engaged in offering their views as to its effect here.

**3.** Restitution as it relates to criminal cases currently is regulated in §§ 11–601–11–618 of the Criminal Procedure Article. For a thorough review of the history of restitution, *see* Judge Wilner's discussion in *Grey v. Allstate Ins. Co.*, 363 Md. 445, 450–62, 769 A.2d 891, 894–900 (2001). The current relevant version of § 11–603 remains unchanged from the 2001 version, enacted by Chap. 10, Acts 2001, in effect at the time of Williams's sentencing.

(a) *Conditions for judgment of restitution.*—A court may enter a judgment of restitution that orders a defendant or child respondent to make restitution in addition to any other penalty for the commission of a crime or delinquent act, if:

(1) as a direct result of the crime or delinquent act, property of the victim was stolen, damaged, destroyed, converted, or unlawfully obtained, or its value substantially decreased;

(2) as a direct result of the crime or delinquent act, the victim suffered:

\*　　\*　　\*　　\*　　\*　　\*

(ii) any other direct out-of-pocket loss

\*　　\*　　\*　　\*　　\*　　\*

(c) *Effect of judgment of restitution.*—(1) A judgment of restitution does not preclude the property owner or the victim who suffered personal physical or mental injury, out-of-pocket loss of earnings, or support from bringing a civil action to recover damages from the restitution obligor.

\*　　\*　　\*　　\*　　\*　　\*

Because the record does not reveal that the three motorcycles at issue were damaged when recovered by police within a day or two of their theft, presumably, had Jones been able to reclaim the vehicles from the Baltimore City impound lot, his situation would not have fit within the relevant statutory justifications supporting an order of restitution in this case.[4] The key factual predicate for whether the order entered in this case was proper was that the Baltimore City authorities rebuffed Jones's attempt to repossess the motorcycles because he could not offer sufficient evidence of his ownership of the vehicles.[5] Had Jones been able to do so, Williams' argument,

---

4. In addition to the record lacking evidence of damage to the motorcycles arising from their theft, there was no evidence the vehicles suffered depreciation in value or that Jones incurred any particular amount of out-of-pocket loss related to the theft.

5. The agreed statement of facts supporting the plea in this case offers as the only reason the motorcycles were not returned to Jones that he did not offer proof of title to them in his name. The further suggestion in

the agreed statement is that Jones had not titled the vehicles in his name because of his belief that titling was not required if they were only "used ... for off road purposes." The parties to this case have not concerned themselves much with analyzing the legitimacy of the reason offered for the refusal to return the vehicles.

There is a meaningful difference between titling and registration under the relevant State statutes. Section 13–101.1 of the Transportation Article of the Md.Code (1977, 2002 Repl.Vol.), requires that, unless covered by an exception enumerated in § 13–102 (none of which appear relevant here), "the owner of each vehicle that is in this State and for which the [Motor Vehicle] Administration has not issued a certificate of title shall apply to the Administration for a certificate of title of the vehicle." A "vehicle," within the meaning of the Maryland Vehicle Law generally, is "any device in, on, or by which any individual or property is or might be transported or towed on a highway." § 11–176(a), Transp. Art. A certificate of title to a vehicle is *prima facie* · evidence of who owns it. § 13–107(a)(2) and (c), Transp. Art. The Administration is precluded from issuing registration of a vehicle unless it also "has issued to the owner [of a vehicle] a certificate of title of the vehicle...." § 13–402(b), Transp. Art.

Vehicle registration, as a separate documentary process, requires that "each motor vehicle ... driven on a highway shall be registered" with the Administration, unless "otherwise provided in ... the Maryland Vehicle Law." The definition of "motor vehicle," as opposed to merely a "vehicle," is generally a "vehicle that is self-propelled...." § 11–135, Transp. Art. A "motor cycle," as a sub-species of both "vehicle" and "motor vehicle," is generally a motor vehicle that: (1) has one front wheel and one or two rear wheels on a single axle; (2) is self-propelled by a motor with a rating of more than 1.5 brake horsepower and a capacity of at least 49 cubic centimeters piston displacement; (3) has a singular front steering road wheel mounted in a fork assembly that passes through a frame steering bearing and to which is attached a · handlebar or other directly operated steering device; (4) has a seat that is straddled by the driver; and (5) except for a windshield or windscreen, does not have any enclosure or provision for an enclosure for the driver or any passenger. § 11–136, Transp. Art. We shall assume for purposes of this opinion that the pertinent three motorcycles held in the Baltimore City impound lot met this definition. If required to be registered, a motor vehicle may be registered without a certificate of title (§ 13–402(b) notwithstanding), but only under very limited conditions. § 13–109, Transp. Art.

Of greater relevance to the "facts" of the present case, however, is the provision of § 25–102.1 of the Transportation Article:

**§ 25–102.1. Off-the-road motorcycles.**

(a) *Definition.*—(1) In this section, "off-the-road motorcycle" means a motorcycle not otherwise registered under this article.

(2) "Off-the-road motorcycle" includes motorcycles designed for off-the-road operation, motorcycles not otherwise eligible for registration under this article, and motorcycles commonly referred to as "dirt bikes".

at least in its present posture, could not be maintained. Because Jones's inability to recover the undamaged vehicles was arguably due solely to his sin of omission in not titling the vehicles in his name and producing proof of those titles (or alternative documentation of ownership), Williams maintains

(b) *Regulation.*—Each county and Baltimore City may regulate the operation of off-the-road motorcycles, require them to be registered, and impose a registration fee for them.

From the foregoing regulatory scheme, we glean that, assuming the motorcycles were off-the-road motorcycles and used only for that purpose (within the meaning of § 25–102.1), Jones (if he was the owner) was not required to register them with the State Motor Vehicle Administration, but was required to apply to the Administration for a certificate of title as to each.

Of tangential interest and adding to the complexity of whether Jones could have produced evidence of ownership of the motorcycles, Jones's home county, Baltimore County, where the motorcycles were stored at the time of their theft by Williams, required registration of "off-the-road motorcycles." *See* generally §§ 21–12–101 through 21–12–308, Baltimore County Code (2004). Submission of an application for such registration must include (1) the identity of the owner and (2) the current certificate of title issued by the State Motor Vehicle Administration, a certificate of origin, or a genuine bill of sale. § 21–12–201(b) and (c), County Code. When the County issues such a registration, the owner receives a registration card bearing, among other things, his or her name as owner, a registration number assigned by the County for each motorcycle, the manufacturer's serial number on the motorcycle's engine and frame, and a description of the motorcycle. § 21–12–205, County Code. The registration card is to be carried by the owner "at all times." § 21–12–211, County Code. If a registered motorcycle is sold, the seller is required to inform the buyer that registration may be required before the motorcycle may be driven in the County. § 21–12–210, County Code.

By the same token, Baltimore City (where Jones sought to reclaim the property) appears to have exercised a bit differently its authority granted by § 25–102.1(b) of the Transp. Art. of the Md.Code. Section 40–6 of the Baltimore City Code prohibits outright the driving or riding of any dirt bike or unregistered motorcycle on any public or private property in the City. Apparently, under this prohibition, registration with the City is not an option to legitimate such vehicles.

On this record, we do not know whether Jones registered these off-road motorcycles with Baltimore County, or whether he possessed a certificate of title or other evidence of ownership as required by the State Vehicle Law. What we may observe, however, is that apparently there were alternate means by which Jones could have acquired and produced evidence of his ownership of the three motorcycles, an apparent condition precedent to their release by the impound lot

Jones suffered no loss or injury for which restitution could be ordered (within the meaning of the statute), and, in any event, if his inability to reclaim the motorcycles was deemed a loss or injury, the loss or injury did not occur as the "direct result" of the theft.

Once again, we are called upon to construe and apply a statute. The overarching standard in any such analysis may be stated succinctly. "Our preeminent goal is to discern and implement legislative intent, and, to do that, we begin with the plain meaning of the statutory language. If the intent is clear from that language, there is no need to search further." *Walker v. Dept. of Human Res.*, 379 Md. 407, 420, 842 A.2d 53, 61 (2004), quoting *Allstate v. Kim*, 376 Md. 276, 290, 829 A.2d 611, 619 (2003); *see also Podgurski v. OneBeacon Ins. Co.*, 374 Md. 133, 142, 821 A.2d 400, 405–06 (2003); *Maryland Div. of Labor & Industry v. Triangle Gen. Contractors, Inc.*, 366 Md. 407, 420–21, 784 A.2d 534, 541–42 (2001); *Anne Arundel County, Md. v. City of Annapolis*, 352 Md. 117, 123, 721 A.2d 217, 220 (1998). We find that is the case here.

As we recently reiterated in *State v. Garnett*, 384 Md. 466, 863 A.2d 1007 (2004):

Restitution imposed under Article 27, Section 807 [6] "is a *criminal sanction,* not a civil remedy." *Grey v. Allstate Insurance Company*, 363 Md. 445, 451, 769 A.2d 891, 895 (2001) (emphasis in original). Judge Wilner, writing for this Court in *Grey*, traced the history of restitution and explained that it serves retributive, deterrent, and rehabilitative objectives, which are the principal functions of criminal punishment. *Id.* at 459–60, 769 A.2d at 899–900. We explained that penal goals are accomplished through restitution to the extent that the defendant is forced to focus on the harm that was caused to the victim. *Grey*, 363 Md. at

personnel. Such a condition seems both reasonable and foreseeable under the circumstances.

**6.** Article 27, Section 807 was recodified without substantive change as Md.Code (2001), § 11–603 of the Criminal Procedure Article.

459, 769 A.2d at 899. Likewise, restitution is a monetary detriment to the defendant and "satisf[ies] society's demand for meaningful justice," thus serving the punitive objective of the criminal system.

Op. at 475, 863 A.2d at 1012. (some internal citations omitted).

Instructive to the present case is our recent opinion in *Pete v. State*, 384 Md. 47, 862 A.2d 419 (2004). Pete committed second degree assault on a woman in her apartment and fled the scene in a pickup truck. *Id.* at 51, 862 A.2d at 421. About two hours later, a police officer on patrol in his marked vehicle in another part of the city spotted Pete in his pickup. *Id.* The officer activated his vehicle's overhead lights and began to follow Pete in an effort to make a traffic stop. Pete sped away, but then abruptly stopped, causing the police cruiser to collide with the rear of the pickup truck. *Id.* at 51–52, 862 A.2d at 421. The police cruiser, it was determined later, suffered $6,490.53 in damages. Pete fled the accident scene, but was captured.

In addition to the second degree assault on the woman, Pete was charged with, among other things, reckless driving in connection with the collision with the police cruiser. Pete was convicted of both offenses. *Id.* at 49–50, 862 A.2d at 420. The trial court sentenced him on the assault conviction to eighteen months imprisonment, with all but two months suspended in favor of three years probation upon release. As one of the conditions of probation regarding the assault conviction and sentence, Pete was ordered to make restitution in the sum of $6,490.53 to the Local Government Insurance Trust (LGIT) for the repairs to the police cruiser. On the non-incarcerable reckless driving conviction, the Court assessed a fine of $250.00. *Id.* at 52–53, 862 A.2d at 421–22.

On certiorari review in this Court, Pete argued, analogous to Williams's argument in the present case, that the order of restitution as to LGIT, whether as a direct part of the sentence or as a condition of probation, was illegal because the damage to the police cruiser was not, within the meaning of § 11–603(a)(1), the "direct result" of the conduct giving rise to

the conviction for second degree assault. *Id* at 50, 862 A.2d at 420.[7]

In considering Pete's arguments in this regard, we observed that "[t]he term 'direct result of the crime' appeared first in the Restitution for Crimes Act of 1977. 1977 Md. Laws, Chap. 581 (H.B.1680); Md.Code (1957, 1976 Repl.Vol., 1977 Cum. Supp.), Art. 27, § 640(b)." *Id.* at 57, 862 A.2d at 424. Regarding the legislative history of H.B. 1680, we commented that there was little

> to suggest that "direct result of the crime" means anything other than that discerned from the plain language. The history of H.B. 1680 shows that the Director of the Department of Legislative Reference of the General Assembly had sought, and received, the existing restitution statutes of the Colorado, Georgia, and Oklahoma code from their respective legislative bodies. Of these statutes, only the Oklahoma statute provided specifically that, " 'Monetary restitution' shall mean the sum paid by the defendant to the victim of his criminal act to compensate that victim for the economic loss suffered as a *direct result* of the criminal act of the defender." 1976 Okla. Sess. Laws c. 160, § 5 (emphasis added).

*Id.* at 58, n. 14, 862 A.2d at 425.

Pete argued primarily a plain meaning approach to construing § 11–603(a)(1)'s "direct result" language, by which restitution would be "limited to the victim of the qualifying crime and that victim's injuries and/or damages arising from that crime." *Id.* at 59, 862 A.2d at 426. Alternatively, he urged that we apply tort proximate cause analysis to illuminate what the

---

7. The charge of reckless driving, which arose directly from the collision of the police vehicle with Pete's pickup truck, was not a "crime" for which restitution may be ordered under the statute. *Pete,* 384 Md. at 56–57, 862 A.2d at 424. Reckless driving is a non-incarcerable misdemeanor. For purposes of restitution being authorized as a direct part of a sentence, the related "crime," when it is a violation of the Transportation Article, must be punishable by a "term of confinement". *Id.* at 56, .862 A.2d at 424; Md.Code (2001), § 11–601(d)(2), of the Criminal Procedure Article.

Legislature meant by "direct result." *Id.* By application of the latter to his facts, the intervening event of his reckless driving incident, occurring in another part of the city from where the assault took place [8] and approximately two hours later, would break the chain of causation between the assault and the damage to the police cruiser. *Id.*

In *Pete,* the State advocated a broad reading of § 11–603. Under its approach, if the State "can obtain a conviction for a crime where restitution may be had, but is not ordered, and [also] conviction of [another], related crime, then restitution may be ordered to the appropriate victims as an appropriate sentence under the related crime. Such a reading would require solely 'a nexus between the defendant's criminal activity and the losses that form the basis for an order of restitution.' " *Id.* at 60, 862 A.2d at 426. The nexus would be satisfied if the losses were merely "related to" the crime or crimes for which a defendant was convicted. Thus, under the State's "Single Charging Document" doctrine, any count for which a defendant is convicted under the same charging document would be sufficient to satisfy the "direct result" standard. *Id.*

The Court in *Pete* declined specifically to engage in tort proximate cause analysis (*id.* at 60, 862 A.2d at 420, n. 15) or even to "weigh the persuasion quotient of an attenuated nexus between the damages to [the police cruiser] and the assault. . . ." *Id.* at 60–61, 826 A.2d at 426–27.[9] Instead, we explained:

> The General Assembly has required a direct result between the qualifying crime committed and the damages inflicted before restitution may be ordered. Any attempt by a court to craft a proximate causation, mere nexus, or single charg-

---

8. No hot pursuit was in process in connection with the earlier assault.

9. The trial judge's comments in this case imply that a tort-like ("but for") proximate cause analysis was used, "[d]on't we have to take the victims the way we find them?" It is exactly this manner of analysis that the Legislature foreclosed by allowing restitution only where the loss was the "direct result of the crime."

ing document substitute would be clearly contrary to the plainly-worded intent of § 11–603.

In this case, the collision with, and resultant damage, to Patrolman Cheesman's cruiser are a direct result of Pete's reckless driving, not his assault on Ms. Raickle. The damage to the cruiser is a direct result of Pete stopping abruptly, from a relatively high rate of speed, in the path of the cruiser. Reckless driving, by definition, is driving with a "wanton or willful disregard for the safety of persons or property." § 21–901.1 of the Transportation Article. In this case, Pete's wanton or willful disregard was for the safety of Patrolman Cheesman, his police cruiser, and possibly any other person, vehicle, or property on the same roadway or placed at risk by Pete's driving. It is easy to see on this record that the damage to the police cruiser could not be a direct result of the assault on another individual that occurred approximately two hours earlier than the vehicle collision.

*Id.* at 61, 826 A.2d at 427.

■ The facts of the present case compel a similar conclusion to that reached in *Pete,* perhaps even more clearly so. Jones's inability to reclaim the undamaged motorcycles was not the direct result of Williams's theft of them. While there is undeniably a causal link between the theft in Baltimore County and the motorcycles ending up in the Baltimore City impoundment lot, that nexus does not partake of the directness required by the statute. Moreover, Jones's failure to produce proof of ownership to secure release of the vehicles is in no way a direct result of their underlying theft. The aftermath of the theft in this case merely revealed Jones's possible failures to title properly the motorcycles with the State and/or register them with Baltimore County. If Jones can muster some means of proving ownership and satisfy the Baltimore City authorities, he presumably will be able yet to recover the undamaged vehicles. Failing that, Jones may be able to mount a tort or other civil action against Williams where proof of causation of any alleged damages may be less stringent than in the criminal statute governing restitution.

*See Grey,* 363 Md. at 451, 769 A.2d at 895 ("restitution under the statute is a *criminal sanction,* not a civil remedy"). To compel Williams to make restitution to Jones, under the circumstances revealed by the record in this case, neither complies with the letter of the statute nor fulfills the purposes of restitution (as explicated in *Grey, Pete,* and *Garnett*). Rather it operates to make Williams the insurer of Jones for the latter's possible failure to title and/or register the vehicles. Any loss that Jones may have suffered here (if indeed such may be found to have occurred on these facts) is not represented in the record by any damage to or loss of value caused directly by the theft.

9   OCTOBER 2003 ORDER AND JUDGMENT OF RESTITUTION ENTERED IN THIS CASE BY THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED; COSTS TO BE PAID BY BALTIMORE COUNTY, MARYLAND.